Entered: July 29th, 2025
Signed: July 28th, 2025



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore Division

In re:

TIMOTHY R. BROWN

KENDRA L. BROWN

       Debtors.

CASE NO. 24-16596-NVA

CHAPTER 13[1]

### EDITED[2] OPINION SUPPORTING ORDER CONVERTING
### CHAPTER 13 CASE TO A CASE UNDER CHAPTER 7

The Court has seldom seen a case in greater need of intervention. The debtors have prosecuted their chapter 13 case in such bad faith that the Court is convinced both that cause exists to convert this case to chapter 7 (where a chapter 7 trustee is automatically appointed), and that continuing under chapter 13 is likely to allow ongoing abuse of the bankruptcy process by the debtors. Two of the debtors' creditors and the chapter 13 trustee have joined to request that the Court convert this case.

The Court is confronted by chapter 13 debtors whose behavior has been highly irresponsible and, at times, erratic and inexplicable. By way of example, the debtors own a number

---

[1] This case was converted to chapter 7 by separate Order entered on July 15, 2025. [ECF No. 113].

[2] No substantive changes are made or intended by this edited opinion.

of high-end vehicles, including a Ferrari Spider and a Bentley Mulsanne financed by creditors in this case, which by the debtors' account have simply vanished.  Their inconsistent testimony suggests that at one point their Bentley Mulsanne disappeared from outside a strip club, and at another point that it and their Ferrari Spider somehow ended up in the hands of a repair shop owner who, in turn, supposedly delivered both vehicles to an unknown third party.  Both vehicles remain missing.  The debtors claim to have no idea where either of the vehicles is located and simultaneously have taken no steps to recover them.  They failed to file police reports, make claims against their insurance (before they admittedly cancelled it), or take any other action to safeguard the vehicles.

Further, the debtors have engaged in numerous bankruptcy transgressions.  They have failed to be truthful in their sworn bankruptcy schedules and have declined to fully amend them for months after their deficiencies were brought to their attention.  They were held in contempt for discovery violations months ago and have not acted to this day to clear their contempt.  One of them has operated under two (and perhaps three) social security numbers.

The debtors have injected delay and obfuscation at nearly every turn in their chapter 13 process.  They have filed five proposed chapter 13 plans, all of which are facially unconfirmable.  The most recently proposed plan does not purport to pay their joint tax obligations in full or otherwise satisfy the chapter 7 liquidation test—the most basic of "musts" in a chapter 13 case—rendering it unconfirmable.

Eventually, the Ferrari Spider lender filed a motion to convert this chapter 13 case to a case under chapter 7, in which assets will be marshaled and liquidated under the control and supervision of a trustee.  That motion brings this matter before the Court.  After three days of testimony on that motion, the Court concludes that the debtors should not be permitted to remain in chapter 13, and

that abundant "cause" exists under section 1307(c) of the Bankruptcy Code to convert this case to chapter 7.

### Procedural Background

Ferrari Financial Services, Inc. ("Ferrari") filed the *Motion to Convert Case to Chapter 7* (the "Motion to Convert"), in which it alleges that the totality of the conduct of Timothy R. Brown and Kendra L. Brown (the "Debtors"), both pre- and post-petition, supports conversion of this case. [ECF No. 77]. The Motion to Convert posits that three specifically enumerated statutory types of cause exist here: (i) unreasonable delay by the Debtors that is prejudicial to creditors; (ii) failure to file a plan timely under section 1321; and (iii) failure to commence making timely payments under section 1326. Motion to Convert at 6 (citing to 11 U.S.C. §§ 1307(c)(1), (3), and (4)). In addition to the statutorily enumerated types of cause, the Motion to Convert maintains that the Debtors acted in bad faith both pre- and post-petition, and that such bad faith also supports a finding of cause for conversion under section 1307(c). Finally, the Motion to Convert argues that the Debtors' chapter 13 plans have been proposed in bad faith.

Ferrari is joined in its request to convert this case by U.S. Bank National Association ("US Bank"), another similarly situated creditor that provided financing for a 2018 Bentley Mulsanne (the "Mulsanne"). [ECF No. 94]. The Debtors filed an opposition to the Motion to Convert, blaming any defects in their bankruptcy paperwork on their former counsel and the "disappearance" of Ferrari's and US Bank's collateral on third parties. [ECF No. 86]. The Court conducted three days of evidentiary hearings on May 15, 2025, May 21, 2025, and May 23, 2025, ordered the filing of post-hearing submissions, and set closing argument, if deemed necessary, for July 15, 2025. [ECF Nos. 95, 98, 99, 102]. The chapter 13 trustee filed a joinder to the Motion to Convert supporting conversion of this case, and the parties submitted *Ferrari Financial Services,*

*Inc.'s Proposed Findings of Fact and Conclusions of Law with Respect to Motion to Convert Case to Chapter 7* ("Ferrari's Post-Hearing Brief") and *Debtors' Response in Opposition to Creditor's Motion to Convert Case from Chapter 13 to Chapter 7* ("Debtors' Post-Hearing Brief").  [ECF Nos. 108, 109, 110].

After reviewing the pre- and post-hearing submissions of the parties and the evidence presented at the hearings, the Court concludes that (1) the Debtors are not credible, (2) permitting the Debtors to remain in a chapter 13 case is likely to result in a continuing abuse of the bankruptcy process, (3) abundant "cause" for conversion or dismissal exists under section 1307(c) of the Bankruptcy Code, and (4) conversion, not dismissal, is in the best interests of creditors and the estate.  Accordingly, by separate Order, the Court has converted this case to a case under chapter 7 of the Bankruptcy Code.[3]  [ECF No. 113].  The Court's reasoning follows.

## Legal Standards

The Bankruptcy Code provides that:

> Except as provided in subsection (f) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause[.]

---

[3] The parties appeared at a hearing on July 15, 2025, at which the Court anticipated hearing closing arguments.  The hearing was to be jointly conducted with a hearing in the related adversary proceeding styled *Ferrari Financial Services, Inc. v. Timothy Brown and Kendra Brown*, Case No. 25-00063, on several papers.  At that hearing, the parties advised the chapter 13 trustee and the Court for the first time that they were working on a settlement of the issues raised both here and in a related adversary proceeding, and sought a continuance of both matters.  They said that they had the framework of an agreement, but their discussions had not yet advanced to the point where they could place terms on the record.

The Court offered the parties the opportunity to present closing argument in this contested matter (which both sides declined), and indicated that, notwithstanding the parties' continuance request, the Court would issue an order on the Motion to Convert later in the day.  When asked, the parties stated that they wanted the Court to continue the adversary proceeding, and the Court said its staff would coordinate a continued hearing date for that proceeding.  Ferrari did not withdraw the Motion to Convert, and it thus remains extant, fully briefed.  Given the exigencies of this case, the Court entered the Order converting this case promptly.  This opinion sets out its reasoning.

11 U.S.C. § 1307(c).[4]   The Bankruptcy Code lists eleven examples of cause, but the list is not

exhaustive. *Sugar v. Burnett*, 130 F.4th 358, 373 (4th Cir. 2025).   "Case law has further recognized

that [cause] includes bad faith.  *Id.*; *In re Kestell*, 99 F.3d 146, 148 (4th Cir. 1996) ("Reasons

constituting 'cause' for dismissal include enumerated ones, such as unreasonable and prejudicial

delay by the debtor or material default by the debtor … as well as judicially construed ones such

as bad faith.") (internal citations omitted); *In re Kotche*, 457 B.R. 434, 440 (Bankr. D. Md. 2011)

("[A] court's finding of bad faith constitutes cause for conversion of [a] case to Chapter 7 pursuant

to Section 1307(c).").

Where the alleged cause for conversion or dismissal is "bad faith," courts "consider the

totality of the circumstances."  *Sugar*, 130 F.4th at 376; *see also Janvey v. Romero*, 883 F.3d 406,

412 (4th Cir. 2018); *In re Seeram*, 669 B.R. 157, 160 (Bankr. D. Md. 2025); *In re Kelly*, 656 B.R.

541, 591 (Bankr. D. Md. 2023), *aff'd sub nom. Kelly v. Naples Prop. Holding Co.*, LLC, No. CV

DLB-24-184, 2025 WL 974345 (D. Md. Mar. 31, 2025); *In re Lin*, 499 B.R. 430, 436 (Bankr.

S.D.N.Y. 2013).   Courts are not limited to post-petition circumstances in considering whether a

debtor has acted in bad faith, but may also consider a debtor's pre-petition conduct.  *See Marrama*

*v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) ("[F]ederal courts are virtually

unanimous that prepetition bad-faith conduct may cause a forfeiture of any right to proceed with a

Chapter 13 case."); *Kelly*, 656 B.R. at 577 (discussing *Marrama*).

> The fact-based nature of the inquiry makes generalizations difficult, and
> courts have noted various factors that are relevant to the "lack of good faith"
> analysis in the context of determining "cause" under Code § 1307(c).
> Nevertheless, the general theme of the case law is that "cause" for
> conversion or dismissal exists **when the moving party demonstrates that**
> **the debtor is attempting to use her Chapter 13 case to accomplish**
> **something other than its purpose** (i.e., the filing, confirmation, and
> consummation of a plan) **or is not prosecuting the case in the manner that**
> **Chapter 13 contemplates** (i.e., the filing of papers that properly disclose

---

[4] The exception noted in subparagraph (f) prohibits conversion if the debtor is a farmer, absent the debtor's request.

financial information material to the case and do not contain material omissions or inaccurate or misleading information).

Thus, courts have found "cause" based on the debtor's inability to propose a confirmable plan or when she has failed to list a significant asset on her schedules or has otherwise misstated or omitted important information. A debtor's failure to cooperate with the Chapter 13 trustee and creditors with regard to the furnishing of accurate information is also a consideration in determining whether a lack of good faith exists.

Chapter 13 Practice & Procedure § 20:5 (emphasis added).

When a party other than the debtor seeks conversion or dismissal of a chapter 13 case, the Bankruptcy Code requires that party to make a showing of cause.  11 U.S.C. § 1307(c).  Where cause has been established, the Court must then determine whether conversion or dismissal "is in the best interest of creditors and the estate."  *Id.*  And, even where cause has been established, the Court is not required to convert or dismiss a case.  *Id.* ("… the court *may* convert … the court *may* dismiss …").  The Bankruptcy Code does not define "cause," and the list provided in section 1307(c) is illustrative, not exhaustive.

In *Sugar*, the Fourth Circuit discussed the analysis undertaken when dismissal of a chapter 7 case is sought for cause based on bad faith and applied the same analysis to section 1307(c).  130 F.4th at 376.  Specifically, the Fourth Circuit explained that "if the 'cause' relied on to dismiss is a debtor's 'bad faith,' then courts must consider the totality of the circumstances … when assessing whether the requisite bad faith exists."  *Id.*  *Sugar* relies in part on *Janvey v. Romero*, where the Fourth Circuit discussed how to analyze a motion to dismiss a chapter 7 case for cause based on bad faith.  *Id.*  In *Janvey*, the Fourth Circuit explained that the "bar for finding bad faith is a high one" and that "bad faith exists only where 'the petitioner has abused the provisions, purpose, or spirit of bankruptcy law.'"  883 F.3d at 412 (quoting *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000)).

**Background**

In February 2017, Mr. Brown purchased a 2017 Ferrari 488 Spider (VIN ZFF80AMA7H0224326) (the "Spider").  Five years later, in February 2022, Mr. Brown refinanced the Spider with Ferrari.  Around November 2022, Mr. Brown stopped making payments to Ferrari and, unbeknownst to Ferrari, caused the Spider to be delivered to H&A Auto Group, LLC ("H&A").  Conflicting reasons were offered by Mr. Brown for taking the Spider to H&A, including that it needed repairs due to an accident and that Mr. Brown wanted to restore the Spider to stock condition and sell custom parts H&A had previously installed at Mr. Brown's request.  Again unbeknownst to Ferrari, the Spider was at some point subsequently removed from H&A's repair facility by person(s) unknown.

Following Mr. Brown's default on his obligations to Ferrari, Ferrari pursued Mr. Brown in state court and obtained a judgment in the District Court of Maryland for Baltimore County (the "State Court Action") against Mr. Brown for $229,548.35.  Following entry of the judgment, Ferrari undertook collection actions in the State Court Action by garnishing bank accounts belonging to the Debtors at Bank of America and M&T Bank.  The Debtors sought the release of the garnished accounts in the State Court Action, and a hearing was scheduled to consider the Debtors' papers on August 6, 2024.  The same day, the Debtors filed their joint bankruptcy petition here, staying the State Court Action.

Within weeks of the Debtors' bankruptcy filing, Ferrari sought leave to conduct examinations of the Debtors pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  [ECF Nos. 17, 18].  The Court granted Ferrari's request on September 17, 2024, ordering the Debtors to appear for depositions and to produce documents requested by Ferrari, and Ferrari thereafter scheduled the depositions of the Debtors for October 11, 2024.  [ECF

Nos. 21, 25].  On October 11, 2024, Ferrari filed the *Motion to Compel Compliance with 2004 Examination Order and for Sanctions* (the "Motion to Compel"), in which it alleged that the Debtors failed to appear at their noticed depositions and failed to produce documents sought by Ferrari.  [ECF No. 28].  Ferrari sought an order compelling the Debtors to appear for depositions and to produce documents, and for monetary sanctions.  *Id.*

The Court conducted a hearing on the Motion to Compel on November 20, 2024, at which, following argument, the parties came to an agreement which was memorialized in the *Order Compelling Compliance with 2004 Examination* (the "Order Compelling Compliance") entered by the Court on November 26, 2025.  [ECF Nos. 45, 48].  The Order Compelling Compliance required, again, that the Debtors produce the documents sought by Ferrari and that the Debtors attend depositions scheduled for January 7, 2025.  *Id.*  On January 8, 2025, Ferrari filed the *Motion for Order to Show Cause Why Debtors Should Not Be Held in Contempt of Court for Their Willful Failure to Comply with Order Compelling Compliance with 2004 Examination* (the "Motion for Contempt"), in which it alleged that the Debtors had—again—failed to appear for their noticed depositions and failed to produce all of the documents sought by Ferrari.  [ECF No. 61].

The Court issued the *Order to Show Cause Why Debtors Should Not be Held in Contempt of Court for Their Willful Failure to Comply with Order Compelling Compliance with 2004 Examination* (the "Order to Show Cause") on January 29, 2025, requiring the Debtors to show cause why they should not be held in contempt for their failure to comply with the Order Compelling Compliance.  [ECF No. 64].  The Debtors failed to show cause or otherwise respond to the Order to Show Cause, so the Court scheduled a hearing at Ferrari's request for February 27, 2025 (the "Show Cause Hearing").  [ECF Nos. 67, 70].  Two days before the Show Cause Hearing,

Jason E. Miles, Esq., entered an appearance as counsel for the Debtors. [ECF No. 74]. The day prior to the Show Cause Hearing, Ferrari filed the instant Motion to Convert. [ECF No. 77].

At the conclusion of the Show Cause Hearing, the parties again reached an agreed resolution and the Court entered the *Consent Order Resolving Motion and Order to Determine Debtors' Contempt and Sanctions* (the "Contempt Order") on March 4, 2025, memorializing that agreement. [ECF No. 83]. The Contempt Order held the Debtors in contempt, provided that the Debtors could purge their contempt by appearing for depositions and providing a full and complete document production to Ferrari two weeks prior to their depositions, and ordered the Debtors to reimburse Ferrari for its attorney's fees and expenses. *Id.* After the Show Cause Hearing, but before entry of the Contempt Order, Ferrari filed a complaint against the Debtors seeking a determination that the judgment obtained in the State Court Action is not dischargeable under various subsections of section 523(a) and, in the event that the Court converted this case to a case under chapter 7, objecting to the Debtors' discharge under section 727(a).

## Evidence and Analysis

The evidence admitted at the hearings on the Motion to Convert establishes a long history of bad faith conduct resulting in abuse of the bankruptcy process, demonstrating that the Debtors engaged in bad faith conduct both before and after the filing of their bankruptcy case. The same evidence also establishes cause under the enumerated grounds set out in section 1307(c).

### I.   Pre-Petition Conduct Evidencing Bad Faith

At the hearings, Ferrari introduced evidence that established that, more than thirty (30) years ago, Mr. Brown filed a bankruptcy petition in 1993 using a social security number that was not the social security number he was assigned at birth.[5] *See* Ferrari Ex. 18; First Hr'g Tr. 65:19–

---

[5] At birth, Mr. Brown was assigned a social security number ending in 5026. In the 1993 bankruptcy petition, Mr. Brown used a social security number ending in 5062. But for the post-petition conduct which began shortly after the

66:15.[6]  However, at various points during his testimony, Mr. Brown gave decidedly conflicting accounts.  He testified that (1) he had never previously filed for bankruptcy, (2) he could not recall filing the petition in 1993, and (3) his former accountant likely prepared and filed the petition in 1993 on his behalf.  First Hr'g Tr. 62:8–20; 65:19–23; Second Hr'g Tr. 108:14–109:20.

Mr. Brown also testified that, between approximately 1995 and 2014, he used yet another social security number that was not assigned to him at birth.  First Hr'g Tr. 62:24–64:18; 68:4–21; 69:4–70:6.  By way of explanation, Mr. Brown testified that his former accountant had "assigned" him a new social security number ending in 4068 because Mr. Brown had been the victim of identify fraud.  First Hr'g Tr. 63:10–64:20; 68:4–9.  Mr. Brown also testified that the Internal Revenue Service ("IRS") instructed him to discontinue the use of the 4068 social security number around 2014 or 2015, relying on a letter he produced during the hearings.  *Id.*; Debtors' Ex. 2.

The letter, however, does not corroborate Mr. Brown's testimony; it does not mention the Debtors or the 4068 social security number and it contains no instruction to discontinue use of that number.  Debtors' Ex. 2.  Instead, the letter is addressed to Browns Enterprises Inc., relates to Form 1099 filed for tax year 2014, and is a notification that "the recipient information you reported may be incorrect and you may need to update your records or begin backup withholding" concerning an entity named Cooper Electronics LLC.  *Id.*  In short, the only evidence presented by the Debtors about the alleged discontinued use of the 4068 social security number has nothing to do with their argument.

---

1993 bankruptcy, one would not be remiss in believing that the transposition of the last two digits of Mr. Brown's birth-assigned social security number was an inadvertent mistake.

[6] For the sake of clarity, the Court will use the following references to identify the three hearing transcripts: "First Hr'g Tr." (for the hearing held on May 15, 2025), "Second Hr'g Tr." (for the hearing held on May 21, 2025), and "Third Hr'g Tr." (for the hearing held on May 23, 2025).

As Ferrari correctly points out, Mr. Brown has at no point produced any evidence that he was the victim of identify fraud, that his former accountant assigned him the 4068 social security number, or that the IRS issued any instruction to Mr. Brown concerning the use of the 4068 social security number. Ferrari's Post-Hearing Brief at 6, ¶¶ 17–20. Moreover, Mr. Brown used the 4068 social security number when he financed the Spider with Ferrari in 2022 and when he financed the Mulsanne with US Bank in 2019, long after he was allegedly instructed by the IRS to stop using that social security number. *See* Ferrari Exs. 4, 5.

In November 2022, the Debtors stopped making payments to Ferrari on account of the Spider because they could no longer afford them. First Hr'g Tr. 86:6–87:12. That same month, Mr. Brown delivered the Spider to H&A. *Id.* His account of why he did that is wildly inconsistent, unclear, and in the Court's view, just not credible—it was either to have upgrades made, or to have it washed or waxed, or for repairs due to an accident, or for repairs unrelated to an accident, or to restore the Spider to stock condition by having H&A remove non-stock parts. First Hr'g Tr. 87:7–89:11; Third Hr'g Tr. 48:7–12; Ferrari Ex. 16 at 56. Mr. Brown offered evidence supposedly in support of one of these accounts—that he took the Spider to H&A to restore it to stock condition: he offered into evidence an invoice from H&A totaling $118,316.07. Debtors' Ex. 4.

But the invoice does not support his account. First, the invoice is dated September 10, 2022—but Mr. Brown testified that he took the Spider to H&A in November 2022. Second, the invoice identifies a 2017 Ferrari with a VIN of ZFF77XJA4G0217475—but the Spider's VIN is ZFF80AMA7H0224326. Third, the itemized services in the invoice have no apparent connection with restoring the Spider to stock condition (i.e., removing custom parts and installing stock parts). Instead, they include, among other things, two oil changes, two regular maintenances, a tune up, new tires, replacement of a fuel pump, and cover glass for the rear engine. Of particular note is a

line item for 300 days of storage apparently incurred as of September 10, 2022.  Finally, it does not seem credible that the Debtors would take the Spider to H&A because they could no longer afford to make payments, and then incur nearly $120,000 in charges by H&A.  The Debtors offered no credible testimony and no evidence to support the contention that the Spider was taken to H&A for any of the reasons offered in Mr. Brown's testimony.[7]

Why the Spider was taken to H&A takes on more significance because at some point after November 2022, the Spider apparently went missing from H&A.  Mr. Brown testified that when he visited H&A in April 2023 to retrieve the tags from the Spider, the Spider was not there.  Second Hr'g Tr. 25:20–24; 26:24–27:3; 27:14–22.  The Debtors offered no evidence that they (1) filed any police report(s), (2) submitted a claim to their insurer, (3) filed suit against H&A, or (4) undertook any effort to recover the Spider.

II.    Bad Faith Related to the Debtors' Bankruptcy Filings

The Debtors filed for bankruptcy protection on August 6, 2024, the same day a hearing was scheduled in the State Court Action concerning the bank accounts Ferrari garnished.  The Debtors' initial filings contain an astonishing number of material omissions:

1) The schedules omitted both the Spider and the Mulsanne

2) The schedules omitted H&A as a creditor

3) The schedules omitted US Bank as a creditor

4) The schedules omitted two bank accounts at M&T Bank that Ferrari had garnished

5) The schedules omitted the fact that those accounts had been garnished

6) The schedules omitted two bank accounts at Chase Bank

7) The schedules omitted an account at Fidelity Investments

---

[7] Mr. Brown testified that H&A provided him with the invoice in question immediately prior to his deposition on March 31, 2025, or two-and-a-half years after the services were allegedly performed.  This testimony, coupled with the Court's own analysis of the invoice, suggests that the invoice was created solely to support Mr. Brown's testimony.

8)  The schedules omitted ownership of a shotgun and a pistol

9)  The schedules omitted a pre-petition transfer in the amount of $37,425 to an individual named Terrell Shepherd

10) The Social Security Number Verification Page omitted Mr. Brown's use of two other social security numbers ending in 5062 and 4068

The Debtors amended their filings to address some, though not all, of these omissions, but the sheer volume of the initial omissions, especially ownership of the Spider and the Mulsanne and the existence of H&A and US Bank as creditors, is concerning.[8]  The Debtors blame their prior bankruptcy counsel for these omissions.  First Hr'g Tr. 122:15–25; Second Hr'g Tr. 13:2–20; 20:15–18; 22:7–13; 116:5–18; Third Hr'g Tr. 110:19–111:1.  However, these filings are signed under the penalties of perjury and include the affirmation that a debtor has carefully reviewed the papers and that the information provided therein is true and correct.  Two logical inferences can therefore be drawn from the initial omissions and the failure to correct all of those omissions in the amended filings: that (1) the Debtors withheld material information from their prior bankruptcy counsel, or (2) the Debtors failed to carefully review the documents prepared by their prior bankruptcy counsel before they were signed by the Debtors and filed.[9]  Both inferences can be true.  Either inference supports a conclusion that the Debtors perjured themselves and a finding of bad faith by the Debtors.

---

[8] Amended schedules were filed on November 14, 2024, in which the Debtors listed the Spider and the Mulsanne on Schedule A/B and H&A and US Bank on Schedule D.  [ECF No. 39].  It is beyond troubling that the Debtors did not then, and have not to date, amended their schedules to address all of the other glaring omissions, despite having notice of these omissions for months.  The failure to accurately amend all of their schedules despite abundant opportunity to do so convinces this Court that the Debtors do not and will not take their obligations under chapter 13 seriously.

[9] In fact, Mr. Brown repeatedly testified that he failed to review and verify the filings before signing them under penalties of perjury.  Second Hr'g Tr. 20:19–21; Third Hr'g Tr. 24:9–25:9.

III.    <u>Feasibility and Good Faith Proposing of Chapter 13 Plan</u>

A debtor who does not, and cannot, file a confirmable plan violates an enumerated "cause" provision of section 1307(c).  Subsection (1) provides that "unreasonable delay by the debtor that is prejudicial to creditors" is "cause" for conversion or dismissal of a chapter 13 case.  11 U.S.C. § 1307(c)(1).  The Debtors' repeated filing of unconfirmable plans eleven (11) months into their case constitutes just such delay.

The Debtors in this case have not filed, and can no longer file, a confirmable chapter 13 plan.  A chapter 13 plan must (i) pay claims entitled to priority in full and (ii) pay creditors not less than would be distributed to them under a chapter 7 liquidation.  11 U.S.C. §§ 1322(a)(2), (a)(4).  In addition, for the Court to confirm a plan, both the plan and the chapter 13 case itself must be filed in good faith.  11 U.S.C. §§ 1325(a)(3), (a)(7).  For the reasons explained below, each of the proposed chapter 13 plans are not confirmable.  And for the myriad reasons discussed throughout this opinion, the Court concludes that the Debtors filed their chapter 13 petition in bad faith, foreclosing the possibility that any hypothetical, subsequently filed chapter 13 plan offered by the Debtors would be confirmable.

Central to an evaluation of the Debtors' proposed plans is an understanding of the Debtors' assets and the equity in those assets.  For the reasons explained *supra*, the Court is skeptical about the accuracy and completeness of the Debtors' schedules.  Nonetheless, for purposes of evaluating the Debtors' plans, reliance on the Debtors' own schedules—which presumably include the valuations of assets most favorable to the Debtors—is sufficient to demonstrate that the Debtors' plans are facially unconfirmable.

The Debtors scheduled the value of their primary residence on Amended Schedule A/B as $1,334,502.00 and indicated that the residence is owned as tenants by the entireties.  [ECF No.

39].  The Debtors likewise scheduled the mortgage claim on their residence on Amended Schedule D in the amount of $522,378.00.  *Id.*  Therefore, the Debtors have approximately $812,124.00 in equity subject to the tenants by the entireties exemption recognized under Maryland law, which they claimed on Schedule C.  [ECF 1].

The Debtors also scheduled an ownership interest in Brown's Enterprises Inc. ("Brown's Enterprises") on Amended Schedule A/B, valued at $268,490.62.  [ECF No. 39].  The Debtors claimed $11,000.00 worth of exemptions relating to Brown's Enterprises on Schedule C.  [ECF No. 1].  After subtracting $33,230.05 in scheduled claims on Schedule D secured by Brown's Enterprises, the Debtors are left with $224,260.57 in equity.  Unlike the residence, the Brown's Enterprises equity is not scheduled as being subject to the tenants by the entireties exemption.

The Debtors have proposed five chapter 13 plans during the pendency of this case.  Their first plan, filed contemporaneously with the petition, proposes to pay $750.00 each month for 60 months, for total plan funding of $45,000.00.  [ECF No. 2].  The first plan identifies an expected priority claim by the IRS of $30,000.00.  *Id.*  Like the Debtors' original schedules, their first plan provides for no treatment of Ferrari's or US Bank's secured claims.  *Id.*

The Debtor's first amended plan was filed November 14, 2024, after the meeting of creditors was initially convened, and after the IRS filed its amended proof of claim asserting a claim for $173,275.82, including a priority claim in the amount of $119,698.18.  [ECF No. 40].  The first amended plan makes some improvements.  Specifically, plan funding is increased to a total of $236,700.00 and the first amended plan now treats the secured claims of Ferrari and US Bank (by surrendering the Spider and the Mulsanne) and creates two classes of unsecured creditors—one class for the IRS and one class of all other general unsecured creditors to be paid *pro rata*.  *Id.*  The separate treatment for the IRS's claim recognizes that the Debtors' tenants by

the entireties equity in their real property does not prevent the IRS claim from attaching to that equity. *See United States v. Craft*, 535 U.S. 274, 288 (2002) (holding that an interest in entireties property is available to satisfy the tax obligations of only one owner of the property). Notwithstanding the improvements, the first amended plan is facially unconfirmable. In order to satisfy the chapter 7 liquidation analysis test under section 1325(a)(4), the Debtors' amended plan needed to pay no less than $224,260.57—the equity from Brown's Enterprises—for general unsecured creditors because the IRS claim would have to be paid in full given the Debtors' equity in their residence. Therefore, and without accounting for payments to their counsel or the chapter 13 trustee's commission, the Debtor's amended plan needed to provide for total plan payments of roughly $400,000.00; the $236,700.00 proposed is grossly insufficient.

The Debtors' second amended plan, filed after the Debtors changed counsel, is likewise unconfirmable. [ECF No. 81]. The second amended plan decreases plan funding to $150,300. *Id.* This alone renders the plan unconfirmable given that the IRS's claim must be paid in full. Yet, shockingly, in this iteration of their plan, the Debtors no longer recognize that the IRS's claim must be paid in full, notwithstanding that they attempted to do so in the previous version of the plan. *Id.* Moreover, the failure to account for the equity in Brown's Enterprises remains an issue, and for these reasons, the second amended plan is facially unconfirmable.

While the third and fourth amended plans increase plan funding, they remain facially unconfirmable for failing to properly treat the IRS's claim and to satisfy the chapter 7 liquidation test. Given the Debtors' history of filing unconfirmable plans that do not adequately treat specific claims or satisfy the chapter 7 liquidation test, especially in light of the fact that the Debtors exhibited an understanding that at least the IRS's claim had to be paid in full, the Court finds that

none of the Debtors' plans were proposed in good faith.  These bad faith filings only serve to support the Court's conclusion that no subsequent plan could possibly be confirmable.

IV.    <u>Post-Petition Conduct Evidencing Bad Faith</u>

The Debtors twice failed to attend their noticed depositions after the Court granted Ferrari's request to conduct examinations under Bankruptcy Rule 2004 and twice failed to timely produce documents Ferrari had sought pursuant to pertinent discovery requests.  [ECF Nos. 28, 61].  The Debtors' conduct necessitated several orders compelling them to attend their depositions and produce documents.  [ECF Nos. 48, 64, 83].

When the Debtors finally sat for depositions, they had not timely produced all of the documents Ferrari was seeking and that they were under Court Order to supply.  Ferrari Ex. 16 at 7–10; First Hr'g Tr. 22:11–30:7.  The invoice from H&A was produced **<u>at</u>** Mr. Brown's deposition, despite this Court's Order requiring the Debtors to provide a full and complete production two weeks earlier to purge their civil contempt.  [ECF No. 83].  A series of text messages between Mr. Brown and the owner of H&A was not produced until **<u>the evening before</u>** the first hearing, despite this Court's Order requiring the Debtors to provide a full and complete production a month earlier to purge their civil contempt.  *Id.*; Second Hr'g Tr. 30:3–8.[10]  At their depositions on March 31, 2025, the Debtors provided testimony under oath that conflicts with their later testimony during the hearings on the Motion to Convert:

- Mr. Brown gave conflicting testimony concerning the reason for taking the Spider to H&A in November 2022.  At his deposition, he testified under oath that he took the Spider to H&A because "[i]t barely would start sometimes, so -- yeah, it wouldn't start that much, so he had to diagnose to see what the problem was in the car."  Ferrari Ex. 16 at 11–12.  He then testified that the reason was for "taking off the rims, putting back everything back to stock, so I could sell some of that stuff."  *Id.* at 15.  At the hearings, however, Mr. Brown testified under oath that he took it to H&A for "[p]robably for some upgrades" (First Hr'g Tr. 87:10–11); "to wash it, wax it" (*id.* 87:12); to "remove

---

[10] The Debtors' failure to timely produce the H&A invoice and these text messages supports the conclusion that the Debtors are in contempt of this Court's Order.

extras" (*id.* 87:13–15); because it was "involved in an accident [and] had a couple scrapes" (*id.* 87:24–88:1); and "to remove all the extras, get it back to stock condition" (Third Hr'g Tr. 48:7–12).

- Mr. Brown gave conflicting testimony concerning his efforts, or lack thereof, to recover the Spider from H&A. At his deposition, he testified under oath that he did not try to get the Spider back. Ferrari Ex. 16 at 18–19 ("Did I try to get it, no, I couldn't get it. He wouldn't give it back to me."). He then testified that email demands were sent to H&A for the return of the Spider (*id.* at 22); that he told H&A's owner he needed the Spider back (*id.*); and that he did not ask to see the purported mechanic's lien H&A had asserted against the Spider (*id.*). When asked whether he had filed a police report or filed an insurance claim, Mr. Brown did not directly respond to either question. *Id.* at 22, 32. At the hearings, Mr. Brown testified that he never attempted to obtain a copy of a police report or insurance claim that H&A had filed, and that Mr. Brown had never filed his own insurance claim. Second Hr'g Tr. 53:1–7, 12–15; 53:19–54:2.

- Mrs. Brown also gave conflicting testimony. As noted earlier, the Debtors failed to list in their initial schedules a transfer within the requisite look-back period to Terrell Shepherd. When asked at her deposition whether she knew an individual named Terrell Shepherd, she testified that "I don't know who Terrell Shepherd is." Ferrari Ex. 17 at 15. At the hearings, however, she testified that the transfer represented funds that she gave Terrell Shepherd to invest in a marijuana farm. Third Hr'g Tr. 84:4–86:7.

- Mrs. Brown gave conflicting testimony concerning two transfers totaling $37,425. At her deposition, Mrs. Brown testified that she did not know to whom she transferred these funds. Ferrari Ex. 17 at 19. At the hearings, however, she testified that these funds were transferred to Terrell Shepherd so he could invest them in a marijuana farm. Third Hr'g Tr. 85:3–15.

- Mrs. Brown gave conflicting testimony concerning her use of corporate funds to pay the Debtors' residential mortgage. At her deposition, Mrs. Brown testified that she had **always** used corporate funds to pay the mortgage. Ferrari Ex. 17 at 4. At the hearings, however, she testified that she had only started using corporate funds to pay the mortgage after Ferrari garnished two of the Debtors' bank accounts. Third Hr'g Tr. 91:16–25.

The inconsistent testimony about the Debtors' mortgage payments also shows a level of bad faith with respect to the filing of the initial bankruptcy papers. If a debtor's mortgage is being paid by someone other than the debtor, that must be disclosed as either additional income on Schedule I or as a reduced expense on Schedule J. The Debtors failed to make either such disclosure here.

Finally, it should be noted that even **after** the Debtors arrived in this Court to seek bankruptcy protection, they still did not file any police reports about missing property or otherwise

take action to participate in the recovery of their admittedly missing property.  Nor did they seek to engage the authority of this Court by taking any action here against H&A.  To date, the Debtors have neither commenced suit here (such as for the conversion of property of the estate), nor have they sought to employ the powers of this Court to compel turnover of property of the estate from a custodian with possession of it.  These would seem to be the actions that would be taken by a reasonable debtor acting in good faith.  The Debtors' non-action in this case to invoke the powers to recover property of the estate are the essence of irresponsibility and bad faith.

V.    <u>Whether to Convert or Dismiss</u>

The testimony and documentary evidence presented at the hearings more than adequately establishes that the Debtors have engaged in bad faith, both pre- and post-petition, and that they have engaged in conduct specifically identified as cause for conversion or dismissal under section 1307(c) including causing unreasonable delay that is prejudicial to creditors.  Having concluded that ample cause exists under section 1307(c) to support conversion or dismissal, the Court is required next to determine which of those two outcomes "is in the best interests of creditors and the estate."  11 U.S.C. § 1307(c).

"The [Bankruptcy] Code does not define the phrase 'best interests of creditors and the estate.'  Presumably, the parties will be the best judge of their own best interests, and if all of the parties agree on one course of action, the court should accommodate their desire."  7 Collier on Bankruptcy P 1112.04 (16th ed. 2025) (citing *Arkansas, Inc. v. United States Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 802 (E.D. Pa. 2000); *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 793 (Bankr. W.D. Tenn. 1992)).  Although Collier discusses conversion or dismissal in the context of a case filed under chapter 11 of the Bankruptcy Code, the same phrase—"best interests of creditors and the estate"—is applicable in this case, and the Court

finds that the reasoning cited is equally applicable in a chapter 13 case. Both of the creditors—Ferrari and US Bank—most directly affected by the Debtors' conduct request conversion, as does the chapter 13 trustee. The Court must nevertheless make its own determination.

Here, there is no question that conversion, not dismissal, is in the best interests of creditors and the estate. The Debtors have identified nearly $2.1 million in assets, much of which appears to be susceptible to liquidation in order to repay creditors, but only if this case is converted. [ECF No. 39]. Among those assets are the Spider and the Mulsanne, which as noted *supra*, are allegedly no longer in the Debtors' possession. Among the powers vested in a chapter 7 trustee are the powers to "(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest … (4) investigate the financial affairs of the debtor … [and] (6) if advisable, oppose the discharge of the debtor." 11 U.S.C. § 704(a). A chapter 7 trustee may also use the avoiding powers of the Bankruptcy Code to recover property of the estate or its value that has been taken by, or transferred to, third parties. *See, e.g.*, 11 U.S.C. §§ 544, 545, 547, 548, 550, 553. Conversion of this case and appointment of a chapter 7 trustee as a fiduciary will limit, if not eliminate, the Debtors' ability to continue to drag out the bankruptcy process to the detriment of their creditors. Assets of the estate would be marshaled and, where appropriate, liquidated. Creditors would be repaid, in whole or in part, more quickly than they would in a (hypothetically feasible) chapter 13 plan.

Although Ferrari has not argued for dismissal here, the Court must nevertheless consider whether dismissal would be in the best interests of creditors and the estate. If the Court were to dismiss this case, a race to the (state) courthouse would likely follow. The total value of the claims filed in this case is approximately $1.6 million – roughly the same value of the Debtors' scheduled assets when the Spider and the Mulsanne are excluded. It is not inconceivable that at some point

during this race, the Debtors would file another bankruptcy petition to stymie their creditors' efforts in state court, bringing all parties before the Court again. The Debtors' conduct in this case, both in terms of its scope and its repetition, gives the Court little hope that the Debtors would behave any differently in another bankruptcy case.

## Conclusion

For all of the foregoing reasons, the Court finds that "cause" for conversion or dismissal under section 1307(c) has been established and that conversion, instead of dismissal, is in the best interests of creditors and the estate. A separate Order has issued.

cc:     Debtors
        Attorney for Debtors – Jason E. Miles
        Attorney for Movant – Steven R. Goldberg, Christopher L. Hamlin
        Case Trustee – Patricia B. Jefferson
        U.S. Trustee
        Former Case Trustee – Brian A. Tucci, P.O. Box 1110, Millersville, MD 21108

**END OF OPINION**